Thomas HUNTER, Plaintiff,

v.

CUSTOM BUSINESS GRAPHICS and
John Jordan, Defendants.

Civil Action No. 2:08–cv–494.

United States District Court,
E.D. Virginia,
Norfolk Division.

July 1, 2009.

Elaine Kathryn Inman, Ann Katherine Sullivan, Crenshaw Ware & Martin PLC, Norfolk, VA, for Plaintiff.

Christian Lee Connell, Norfolk, VA, for Defendants.

## *OPINION AND ORDER*

ROBERT G. DOUMAR, District Judge.

Presently before the Court is the Defendants' Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth herein, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants' Motion for Summary Judgment.

## I. *Factual and Procedural Background*

### A. *Procedural Background*

The Plaintiff, Thomas Hunter, filed suit on October 17, 2008, in the Eastern District of Virginia. His civil claim alleged three separate counts against the Defendants Custom Business Graphics ("CBG") and John Jordan:

1) Violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132: Plaintiff alleges that Defendants Custom Graphics and Jordan A) failed to remit employee "Salary Reduction and Other Elective Simplified Employee Pension" ("SARSEP") contributions in a timely manner, and B) failed to make the required employer contribution by virtue of funding the employer contribution from the employee's earned commission; and C) upon information and belief failed to make contributions at the same percentage for all employees, in violation of the express terms of the SARSEP. Jordan's SARSEP account was allegedly funded at higher off contribution levels than Hunter.

2) Breach of Employment Contract: Plaintiff alleges that CBG unilaterally and without prior agreement reduced Hunter's commissions from 50% to 48.5% of the gross profit of all of Hunter's sales, in direct violation of the Employment Contract and failed to reimburse Hunter for the use of Hunter's privately owned vehicle at the sum of $100.00 per month.

3) Action for Accounting: Plaintiff claims that Custom Business must render an accounting to Hunter to enable him to determine commissions pursuant to the Employment Contract. Custom Business failed to keep and render accounts of money due by it to Hunter. Custom Business' conduct in failing to provide information regarding gross profits from sales monthly has rendered it impossible for Hunter to ascertain the true state of his commissions.

On May 1, 2009, the Defendants filed this present Motion for Summary Judgment. The Plaintiff has filed his responsive pleadings and the Motion was referred to chambers on May 22, 2009. Thus, the matter is now ripe for judicial determination.

### B. *Undisputed Facts*

The following facts are taken from Defendants' statement of undisputed facts, as

well as from the evidence in the record.[1]

Custom Business Graphics ("CBG") is a Virginia Beach company that engages in the business of producing office-related products. Their work consists of printing and advertising services and products, data processing software, filing systems, and also includes the design, supply and sales of business documents and supplies.

John Jordan is employed by CBG and apparently exercised discretionary authority over administration and control of the SARSEP while the Plaintiff was employed by CBG.

Thomas Hunter was an employee of Custom Business Graphics from 1985 until 2008.[2] He was apparently a profitable salesperson for CBG, and in 1988 he entered into a written employment agreement with the company. Under the terms of this 1988 employment agreement, Hunter agreed to be compensated through commission payments at a rate of 50% of the gross profits of all of his sales.[3] The Plaintiff contends that this 1988 employ-

ment agreement is the same one that remains in effect today.

In 1996, Jordan came to Hunter and Keith Eakes, another salesperson at CBG, and presented both of them with an opportunity to participate in a SARSEP Plan.[4]

Jordan informed them that in order to participate, they would have to reduce their compensation by 1.5% of their gross profits of their sales. Hunter and Eakes were told that this reduction in their commission would thereby fund their contribution to their SARSEP accounts. They were also told that CBG would then make an additional contribution to their accounts as well, thereby resulting in a total contribution of 3%.[5] They agreed to the proposal.

Hunter's Commission Report for December 1999 showed his commission to be 48.55% of the gross profits on his sales. All told, Hunter received over 130 commission reports showing his commission to be 48.55% of the gross profits on his sales. Hunter did not complain to John Jordan

---

1. Local Rule 56 provides that "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."

2. Hunter began working for Custom Business Graphics as a paid salesperson on or about January 2, 1985. On or about April 4, 1988, he entered into a written contract of employment with CBG.

3. In Section Four, the Contract states that "Employer shall pay Representative a commission equal to Fifty Percent (50.0%) of the gross profit of all of Representative's sales." In Section Seven, the Contract states that "Representative shall be entitled to reimbursement for business expenses including the use of his privately owned automobile [at the] [sic] sum of $100.00 per month."

4. The SARSEP had to be established in 1996, because SARSEPs were statutorily abolished

in 1997. IRS Publication 4336 at 1 ("The Small Business Job Protection Act of 1996 (SBJPA) prospectively repealed SARSEPs. Therefore, no new SARSEPs could have been established after December 31, 1996."). A SARSEP receives contributions from two sources. First, the employee may elect to withhold amounts from his or her compensation, which the employer is then required to contribute to the employee's retirement account. Second, the employer is required to make a non-elective contribution in the same fixed percentage to each eligible employee's retirement account. (Mem. in Supp. Summ. J. 5–6 (citing IRS Publication 4336 at 3).)

5. Plaintiff alleges that, in fact, the 1.5% reduction in their commissions was never contributed to their SARSEP accounts. He claims that the 1.5% was simply retained by Custom Business Graphics. The Defendants dispute this and present the Plaintiff's pay stubs as proof. (Mem. in Supp. Summ. J. 7.)

that the 48.55% commission figure was wrong or incorrect.

The Plaintiff now claims that 1.5% contribution into his SARSEP never happened and that Jordan's plan was actually a scheme to establish a retirement plan that would benefit Jordan personally without taking on the required obligation to make the same contribution for Hunter and Eakes. The Plaintiff alleges that Hunter and Eakes were one of only two employees required to take this cut in pay in order to participate in SARSEP. Other employees, including Jordan, allegedly did not take a cut in salary commensurate with the establishment of the SARSEP. The Plaintiff claims that all of the other employees at CBG received the intended benefit of a SARSEP: their salaries remained the same while they also received a 3% contribution from Custom Business Graphics into their SARSEP accounts.

Hunter claims that he did not know that he had been misled until he discussed his SARSEP fund status during a meeting with his accountants in April of 2007. It was at this meeting, he contends, that he first understood the nature of the actions taken by Jordan and Custom Business Graphics.

On or about September 30, 2007, CBG terminated the SARSEP.

Hunter's issues do not end there. His employment agreement also provided for a $100 automobile allowance. Prior to 1990, CBG apparently paid its salesmen, including Hunter, $100 per month to compensate them for using their own cars to make sales calls. The $100 vehicle compensation was added to the sales commissions, thereby making the $100 payment subject to

federal and state income taxes. Prior to 1990, CBG did not reimburse its salespeople for their actual mileage expenses.

In 1990, however, Custom Business Graphics stopped paying Hunter this allowance.[6] Instead, Hunter and the other salespeople submitted monthly "Salesperson Auto Expense" worksheets, showing the mileage they claimed to have driven each month while making sales calls. CBG would then take the mileage reimbursement number for each salesperson and reimburse the salesperson for his or her mileage expenses without withholding any taxes.

So, for example, if a salesperson had $5,000 of earned commissions due in a month, and $500 of automobile mileage expenses, CBG would reduce the salesperson's taxable income to $4,500 ($5,000 minus $500), deduct payroll taxes from the $4,500 figure, and pay that as compensation to the salesperson. Additionally, CBG would write a check for $500 as reimbursement for mileage expenses directly to the salesperson without any payroll deductions.[7]

Hunter maintains that he never agreed to this change in policy. However, the Plaintiff does not dispute that CBG stopped paying the $100 vehicle compensation to Hunter in 1990 and instead paid him as described above from 1990 to 2008.

Hunter stopped working for CBG in January 2008.

## II. *Legal Standard*

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted where "the pleadings, depositions [and] answers to interrogatories ...

---

**6.** Hunter states that January 1990 was the first time that he failed to receive his automobile allowance due him in accordance with the 1988 employment contract.

**7.** This practice apparently relieved the salespersons from having to claim the mileage expenses on their personal tax returns.

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

In ruling on a motion for summary judgment, a court views the facts in the light most favorable to the nonmoving party. *United States v. Lee,* 943 F.2d 366, 368 (4th Cir.1991). The moving party has the threshold burden of informing the court of the basis of the motion and of establishing that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also Catawba Indian Tribe v. South Carolina,* 978 F.2d 1334, 1339 (4th Cir.1992). Once the moving party satisfies this threshold showing under Rule 56(c), the burden of production, not persuasion, shifts to the non-moving party. *Celotex* at 322–23, 106 S.Ct. 2548. The non-moving party must "go beyond the pleadings and by [his] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. *See also* Fed. R.Civ.P. 56(e); *Catawba Indian Tribe,* 978 F.2d at 1339. "The plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Lee,* 943 F.2d at 368.

### III. *Analysis*

CBG and Jordan move for summary judgment as to portions of Count One and all of Count Two, claiming that these portions of the Plaintiff's complaint are barred by the applicable statutes of limitations.

Count One alleges three types of ERISA violations: that the Defendants "[1] failed to make contributions in a timely manner, [2] failed to make the required employer contribution by virtue of funding the employer contribution from the employee's earned commission and [3] ... failed to make contributions at the same percentage for all employees, in violation of the express terms of the SEP." Compl. ¶ 14. The Defendants' summary judgment motion only addresses the Plaintiff's second and third alleged ERISA violations, that is that Jordan and CBG failed to make the required employer contribution by virtue of funding the employer contribution from the employee's earned commission and failed to make contributions at the same percentages for all employees. The Defendants argue that these portions are barred by ERISA's three-year statute of limitations.

Count Two alleges a breach of employment contract claim and has been pleaded only against CBG. The Defendants argue that Count Two is barred by Virginia's five year statute of limitations pertaining to written contracts.

For the reasons discussed below, this Court finds that Plaintiff's suit is time-barred as it concerns his second alleged ERISA claim and therefore grants the Defendants' Motion for Summary Judgment. As to the Plaintiff's third alleged ERISA violation, the Defendants' Motion for Summary Judgment is denied. As to the Plaintiff's allegations of a contract violation, the Court grants the Defendants' Motion for Summary Judgment.

### A. *ERISA claims*

The application of ERISA's three-year statute of limitations turns upon the ques-

tion of when the Defendant had "actual knowledge" of the cause of action.

The statute setting forth the applicable statute of limitations for ERISA violations states:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the *earlier of—*

(1) six years after

(A) the date of the last action which constituted a part of the breach or violation, or

(B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) *three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;*

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113 (2008) (emphasis added).

Unfortunately, the Fourth Circuit has not specifically addressed the definition of "actual knowledge" in the context of a suit brought under ERISA—that is, it has not provided a precise definition of what it considers "actual knowledge of the breach of violation" under Section 413. *Browning v. Tiger's Eye Benefits Consulting,* 313 Fed.Appx. 656, 660–61 (4th Cir.2009). The Fourth Circuit has only stated that "[t]he ERISA statute of limitations begins to run when a plaintiff has knowledge of the alleged breach of a responsibility, duty, or obligation by a fiduciary." *Shofer v. Hack Co.,* 970 F.2d 1316, 1318 (4th Cir.1992) (citations omitted).

As the *Browning* court pointed out, other circuits have come to differing conclu-

sions regarding what constitutes "actual knowledge." *Id.* Both the Third and Fifth Circuits have held that Section 413 "requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim of breach of fiduciary duty or violation under ERISA." *Int'l Union v. Murata Erie N. Am., Inc.,* 980 F.2d 889, 900 (3d Cir.1992). *See also Maher v. Strachan Shipping Co.,* 68 F.3d 951, 954 (5th Cir. 1995). The Third Circuit has explained that " 'actual knowledge of a breach or violation' requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." *Gluck v. Unisys Corp.,* 960 F.2d 1168 (3d Cir.1992) (internal citations omitted).

Conversely, other circuits have determined that actual knowledge is when the plaintiff becomes aware of the events giving rise to the breach, and not when a would be plaintiff becomes aware that those events constituted a legal cause of action. These circuits have stated that the plaintiff must have knowledge of the facts or transaction that constituted the alleged violation and that "it is not necessary that the plaintiff also have actual knowledge that the facts establish a cognizable legal claim under ERISA in order to trigger the running of the statute of limitations." *Wright v. Heyne,* 349 F.3d 321, 330 (6th Cir.2003). *See also Martin v. Consultants & Adm'rs, Inc.,* 966 F.2d 1078, 1086 (7th Cir.1992); *Meagher v. Int'l Assoc. of Machinists and Aerospace Workers Pension Plan,* 856 F.2d 1418, 1423 (9th Cir.1988) (ERISA three-year statute of limitations period began to run when plaintiff received checks that represented reduced benefits

"though [plaintiff] may not have known at the time that the reduction in benefits was unlawful under ERISA"); *Blanton v. Anzalone*, 760 F.2d 989, 992 (9th Cir.1985) ("the statute of limitations is triggered by the [claimants'] knowledge of the transaction that constituted the alleged violation, not by their knowledge of the law").

Moreover, other circuits have attempted to articulate a standard situated somewhere between these two, holding that a "plaintiff has actual knowledge when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir.2001) (emphasis added).

Upon reviewing these various circuits' positions, the Fourth Circuit declined to come to a decision on its definition of the phrase, but it did point out that actual knowledge must be distinguished from constructive knowledge and that actual knowledge "depends largely on 'complexity of the underlying factual transaction, the complexity of the legal claim[,] and the egregiousness of the alleged violation.'" *Browning*, 313 Fed.Appx. at 661 (quoting *Martin*, 966 F.2d at 1086). The *Browning* court added:

> We also agree with the First Circuit that '[t]he amendment to ERISA § 413 means that knowledge of *facts* cannot be attributed to plaintiffs who have no actual knowledge of them,' and that "there cannot be actual knowledge of a violation for purposes of the limitation period unless a plaintiff knows the 'essential facts of the transaction or conduct constituting the violation.'"

*Id.* (quoting *Edes v. Verizon Communications, Inc.*, 417 F.3d 133, 142 (5th Cir. 2005)).

The most relevant opinion from within this district is *Trace v. Retirement Plan for Salaried Employees*, 419 F.Supp.2d 846 (E.D.Va.2006). In *Trace*, the plaintiff claimed that his retirement plan had breached its fiduciary duty to the plaintiff by miscalculating his retirement benefits. The plaintiff had received a certain estimate of his lump sum benefits in February 1998 and then elected to retire in April of that year (based upon the figures in that estimate). When he received his benefits check though, the amount was less than that reflected in the initial estimate. The plaintiff inquired into the difference and was notified in June 1998 that his previous estimate had been calculated based upon an inapplicable assumption and he was provided with an explanation of the proper calculation. The plaintiff asked for a review of the benefits in July 1998, but received no response. Five years later, the plaintiff requested a review and a recalculation and (after a series of requests and denials) was ultimately informed in October 2004 that the matter was closed because he had exhausted his administrative remedies. He consequently filed suit in 2005.

Judge Hudson found that the plaintiff had actual knowledge in June 1998 as that constituted the date in which he was made aware of the facts or transactions that constituted the alleged violation at that time. The court pointed out that the plaintiff had "learned nothing in May of 2004 that had not been explained in detail in June of 1998." *Id.* at 849.

This finding sheds light on what defines an "essential fact" that triggers actual knowledge. According to *Trace*, a plaintiff becomes aware of an essential fact when it obtains "knowledge of the facts or transaction that constituted the alleged violation." *Id.* Therefore, the relevant inquiry must focus upon the alleged violations and the timing of when the Plaintiff became aware of the facts constituting the violation.

In the present case, the alleged violations (with respect to the ERISA claim) are two fold: 1) that CBG (and Jordan) failed to make the required employer contribution by virtue of funding the employer contribution from the employee's earned commission; and 2) that CBG (and Jordan) failed to make contributions at the same percentage for all employees, in violation of the express terms of the SAR-SEP. *See* Compl. ¶ 15. The court will address each in turn.

### 1. *Plaintiff's Actual Knowledge of Custom Business Graphic's Funding of the SARSEP from the Plaintiff's Commission*

■ The first ERISA violation is alleged to have occurred when the Defendants began funding the SARSEP, in part, from the Plaintiff's earned commission.

In paragraph 14 of the Complaint, Hunter alleges that Custom Business Graphics and Jordan began to violate the requirements of ERISA when they "failed to make the required employer contribution by virtue of funding the employer contribution from the employee's earned commission...." He repeats this allegation, in somewhat different form, in the next paragraph, averring that CBG "unilaterally and without prior agreement reduced Hunter's commissions from 50% to 48.5% of the gross profit of all of Hunter's sales, in direct violation of the Employment Contract and to fund the employer's required portion of the SEP contribution." The

Plaintiff alleges that "[p]ursuant to IRS Publication 4633, Custom Graphics was required to make a 3% contribution to the SARSEP account for all its employees." (Mem. Opp'n 10.)

The Defendants maintain that Hunter first learned of these facts in 1996: "[b]ased on communications with Mr. Jordan in December 1996, it was [Hunter's] understanding that the reduction in his commission payments from 50% of the gross profit of his sales to 48.5% of the gross profit of his sales was to fund a SARSEP contribution." (Hunter's Interr. Ans. No. 4.)

The Plaintiff argues, however, that he did not have actual knowledge of the violations under ERISA until April 2007. Hunter says that he was only told in 1996 that the percentage he received from the gross profits of his sales were to be used for his contribution to a SARSEP and the Defendants would then put in their own contribution. In other words, Hunter's understanding, based on the representations of Jordan, was that a total of 3% was to be placed into the SARSEP: 1.5% would come from his agreed reduction in pay and 1.5% would come from the Defendants. It was only when Hunter had his accountants [8] review the contribution to the SARSEP in April 2007 that he discovered that "although he was losing 1.5% of the gross profit of his sales in commission payments, this full amount was not being placed into the SARSEP as his own contribution, with an additional amount provided

---

8. Hunter states: "In April 2007, I met with my accountants regarding my SARSEP account. I was informed that the 1.5% deduction in commissions was not being put into my account as my contribution...." Hunter's Aff. ¶ 10. The Defendants argue that the statement—"I was informed that the 1.5% deduction in my commissions was not being put into my account as my contribution"—is inadmissible hearsay and that there is no showing that the out-of-court declarant who made it, Hunter's accountants, had personal knowledge of those facts. *See* Fed.R.Civ.P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify to the matters stated."). This Order does not address this question of admissibility brought by the Defendants.

by Custom Business Graphics as its contribution." (Mem. Opp'n 8.) Hunter states that he only "learned later [in 2007] that Custom Business Graphics *should have been contributing 3% in addition to any contribution made by him.*" *Id.* (emphasis added).

The filings to date indicate that the Plaintiff first learned of the essential facts in 1996. *See* Hunter's Interr. Ans. No. 4. *Whether he knew that this action was illegal or not is not important.* As the court in *Trace* found, "it is not necessary for a potential plaintiff to have actual knowledge of every last detail of a transaction, or knowledge of its illegality." *Trace*, 419 F.Supp.2d at 848–49. In 1996, when Jordan approached Hunter and Eakes about beginning a SARSEP account (and told the two that they would need to reduce their sales commission in order to partially fund the SARSEP), Hunter thereby had actual knowledge that CBG was "funding the employer contribution from the employee's earned commission...." *See* Compl. ¶ 14. As the undisputed facts make clear, Hunter took no affirmative actions to rectify his SARSEP situation until he first met with his accountants and subsequently filed this civil action in 2007. He had acquired the essential fact for this alleged violation in 1996—and he did nothing about it for eleven years.[9]

### 2. *Contributions to Hunter's SARSEP Did Not Constitute Separate Causes of Action*

In the alternative, the Plaintiff contends that each contribution improperly made into the SARSEP by CBG constituted a separate violation which triggers a new statute of limitations. (Mem. Opp'n 16.)

The Court disagrees.

The Plaintiff relies upon *Meagher v. Int'l Assoc. of Machinists and Aerospace Workers Pension Plan*, 856 F.2d 1418 (9th Cir.1988). In *Meagher*, the court determined that a plaintiff's cause of action accrued when his accrued retirement benefits were "decreased by an amendment of the plan" and that the plaintiff was "harmed only by the wrongful application of the amendment." *Id.* at 1422. Therefore, "[e]ach check issued to him in an amount reduced under the inoperative amendment constitutes a fresh breach by the trustees of their duty to administer the pension plan" in accordance with the rules and regulations set forth by ERISA. *Id.*

This Court feels that it should be bound by prior decisions [10] in this district and its appellate courts. In *Christensen v. Northrop Grumman Corp.*, 125 F.3d 847 (4th Cir.1997), the court held in a published "unpublished" opinion that the plaintiff's ERISA claim was time-barred by ERISA's six-year statute of limitations. Judge

---

9. The Plaintiff also claims that under 29 U.S.C. § 1113, where there is evidence of fraud or concealment, the plaintiff has six years from the date of discovery to bring a claim. Since this Court finds that the Plaintiff had "actual knowledge" of the first violation in 1996, then there is no need to address evidence of fraud in order to trigger a six year statute of limitations for the Plaintiff's allegations.

10. The Court is in a relative quandary as to the degree of reliance it should place upon a

published opinion in the Federal Reporter that was designated as "unpublished." It is disfavored to cite to the Fourth Circuit's unpublished opinions prior to January 1, 2007. 4th Cir. R. 32.1 (citation of unpublished 4th Cir. Opinions). While the holding of this published "unpublished" opinion is relevant to the matter at hand, it is difficult to ascertain its true precedential value being that it was literally published in the Federal Reporter, yet designated as "unpublished."

Bryan of the Eastern District of Virginia granted summary judgment to the defendants after he found that the plaintiff brought suit some fifteen years after the employer decided not to purchase annuities to fund the pension benefit plan. The plaintiff appealed and argued that employer's failure to provide an annual benefit to the pension plan via the annuity constituted a separate violation of ERISA. In an opinion decided by Judges Murnaghan, Phillips, and Britt, the Fourth Circuit affirmed Judge Bryan's decision and held that under ERISA, a breach of fiduciary duty occurs when a company makes the decision on *how* to fund the benefit plans. *Id.* at *4. The employer's subsequent implementation of that plan does not constitute separate causes of action. *Id.* Thus Judge Bryan was affirmed by the Fourth Circuit's published though "unpublished" opinion. Therefore, the statute of limitations began to run immediately after the employer made its decision to implement its benefit plan and when the employer acted upon that plan.

In this case, the Plaintiff claims that the Defendants violated their fiduciary duties when they "failed to make the required employer contribution by virtue of funding the employer contribution from the employee's earned commission." (Compl. ¶ 14.) Fourth Circuit precedent leads this Court to conclude that there was only one possible ERISA violation in this allegation and not, as the Plaintiff would have it, successive violations every time that the Defendants placed unlawful contributions into the SARSEP. Therefore, the fiduciary duty violation occurred in 1996 when the Defendants supposedly obtained the Plaintiff's consent to use his commission to fund the employer contribution to the SARSEP. In other words, the alleged breach or violation occurred when the Defendants decided *how* to contribute into the SARSEP; each subsequent contribution which was part of that initial plan did *not* constitute a new violation.

The limitations period is six years from the breach or violation, or three years from the Plaintiff's knowledge of the breach or violation, whichever is earlier. 29 U.S.C. § 1113(a). As explained previously, the Plaintiff had knowledge of the alleged breach when he agreed to receive a reduced commission percentage in order to fund the SARSEP. It is of no consequence that the Plaintiff may not have known at that time that the reduced commission meant that the Defendants' commensurate SARSEP contribution was unlawful under ERISA.

As the Plaintiff points out in its responsive pleading (and as stated in 29 U.S.C. § 1113), where there is evidence of fraud or concealment, the plaintiff has six years from the date of discovery to bring a claim under ERISA. The Plaintiff argues that there is evidence present to suggest that CBG acted fraudulently. This Court cannot agree. The Plaintiff has thus far failed to properly plead fraud or concealment as it pertains to ERISA's "fraud or concealment" provision because the Plaintiff has not stated the circumstances constituting fraud or mistake with particularity. Fed. R.Civ.P. 9(b). Rule 9 requires that in averments of fraud or mistake, the plaintiff must "identify 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Lamberty v. Premier Millwork and Lumber Co., Inc.,* 329 F.Supp.2d 737, 743 (E.D.Va.2004) (quoting 5 Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1297, at 590 (2d ed. 1990)). The Plaintiff has made no such showing and his breach of fiduciary duty claim is bound by ERISA's three-year statute of limitations.

Therefore, the Court grants the Defendants' Motion for Summary Judgment with respect the Plaintiff's breach of fiduciary duty claim because the statute of limitations for that allegation has run.[11]

### 3. *Custom Business Graphic's Failure to Contribute at Equal Percentages*

■ The third ERISA violation alleged by the Plaintiff occurred when the Defendants failed to make contributions at the same percentage for all employees. The Defendants contend that "CBG contributed 3% of each eligible employee's taxable income to his/her SARSEP for as long as CBG had a SARSEP." (Def.'s Mot. Summ. Jud. 11 (citing Jordan Aff. ¶ 15).)

In its pleadings, the Plaintiff alleges that CBG and Jordan did not compensate all employees at the same rate subsequent to 1996. (Mem. Opp'n 15.) For example, the Plaintiff cites to information indicating that other CBG employees, including Jordan, Jack Glennon, and Brad Smith, experienced higher compensation levels than the Plaintiff when the SARSEP was established (i.e., they did not experience reductions in the percentage of their commission). *Id.* "Instead, they continued to enjoy the same rate of compensation while a 3% contribution of their taxable income was contributed by [CBG] to their SARSEP accounts." *Id.* at 15–16 (citing Jordan Dep. at 26, 28, 62).

This information presented by the Plaintiff provides a sufficient factual basis to withstand the Defendants' Motion for Summary Judgment. The Plaintiff has designated specific facts showing that there is a genuine issue for trial. A reasonable finder of fact could conclude that CBG provided 3% contribution for some

employees (Jordan, Glennon, and Smith), while it provided only 1.5% contribution for Hunter and Eakes (with Hunter and Eakes contributing the other 1.5% to the SARSEP). Therefore Hunter has satisfied his burden of production, *Celotex* at 322–23, 106 S.Ct. 2548, and the Court must deny the Defendants' motion for summary judgment with respect to the Plaintiff's third alleged ERISA violation.

### B. *Breach of Contract Claims*

■ The Defendants argue that Hunter's breach of contract claims are also time-barred—they argue that there were two separate dates in which the alleged breaches occurred and thus accrued. The first was in January 1990 when, as confirmed by Hunter, CBG stopped compensating him at $100 per month for the use of his privately owned automobile. The second was in January 1997 when CBG first reduced his commissions from 50% of the gross profit of his sales to 48.5% in January 1997. According to the Defendants, these answers mean that the Plaintiff's first breach of contract claim was time barred as of January 1995 and his second breach was time-barred as of January 2002.

Not surprisingly, the Plaintiff disagrees and contends that the contract breaches occurred in monthly intervals. That is, each failure on the part of Custom Business Graphics to compensate Hunter in accordance with the Employment Agreement gave rise to a separate, additional injury and a new cause of action, entitling Hunter to bring his claims, at the very least, for all such individual breaches that occurred in the five years preceding the institution of this law suit.

---

11. Courts do not look well upon plaintiffs who first present allegations of fraud in its opposition to a defendant's motion for summary judgment. *Larson v. Northrop Corp.*, 21 F.3d 1164, 1173–74 (D.C.Cir.1994).

The Code of Virginia, § 8.01–230, provides that an action for a breach of a written contract must be brought within five years after the cause of action accrues. The right of action is "deemed to accrue and the prescribed limitation period shall begin to run from the date ... when the breach of contract occurs." Va.Code § 8.01–230.

■ The Court is further guided by the general understanding in Virginia law which provides that statutes of limitation are strictly enforced and exceptions [12] thereto are to be construed narrowly. *Arrington v. Peoples Sec. Life Ins. Co.*, 250 Va. 52, 458 S.E.2d 289, 290 (1995). "[A]ny doubt must be resolved in favor of the enforcement." *Id.*

The question here concerns whether there was one breach of contract by the Defendants, or whether there was actually a series of individual breaches of contract. A survey of Virginia case law indicates that the answer to that question depends entirely upon the nature and type of each individual transaction that supposedly constituted a breach. "Whether the [defendant]'s actions constituted a single continual breach ... or a series of separate breaches ... depends upon the relevant facts." *Am. Physical Therapy Ass'n v. Fed'n of State Bds. of Physical Therapy*, 271 Va. 481, 628 S.E.2d 928, 929 (2006). Three cases from Virginia law are informative to this matter.

In *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543, 379 S.E.2d 316 (1989), Lamps Unlimited, the lessee, sued Westminster, the landlord, for breach of a lease for a space in a shopping center. The lease was signed on July 27, 1976 and was for a term of 10 years. During negotiations, the landlord represented that it would place a uniform hours of operation provision in the leases of all of the tenants in the shopping center. Shortly after commencing operations in October 1976, Lamps Unlimited learned that none of the tenants in the shopping center obeyed the uniform hours of operation requirement, and the landlord did nothing to enforce this requirement. Lamps complained repeatedly about the landlord's failure to enforce the provisions and ultimately vacated the premises in June 1983. It filed its breach of contract action in October 1985.

The Virginia Supreme Court held that where the landlord failed to enforce a provision of a lease from the very inception of the lease, then the complaining tenant's cause of action accrued on the day of the landlord's initial breach of the lease. *Id.* at 319. The Supreme Court stated the following:

> [I]t is well established that 'where an injury, though slight, is sustained in consequence of the wrongful or negligent act of another and the law affords a remedy therefore the statute of limitations attaches at once. It is not material that all the damages resulting from the

---

12. There is no exception to this rule that applies to the instant case. The continuing duty exception applies in only limited circumstances. According to the Virginia Supreme Court, a continuing duty will be found only where "there is an undertaking which requires a continuation of services." *McCormick v. Romans*, 214 Va. 144, 198 S.E.2d 651, 654 (1973). Such situations are extremely limited. The Virginia Supreme Court has recognized that the continuing undertaking doctrine only applies "with regard to a continuous or recurring course of professional services related to a particular undertaking." *Keller v. Denny*, 232 Va. 512, 352 S.E.2d 327, 331 (1987). The Supreme Court of Virginia has "applied the doctrine in cases stating claims of breach of contract or negligence involving the professional services of physicians, attorneys, and accountants." *Harris v. K & K Insurance Agency*, 249 Va. 157, 453 S.E.2d 284, 286 (1995).

act should have been sustained at that time and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.'

*Id.* at 317–18 (quoting *Caudill v. Wise Rambler,* 210 Va. 11, 168 S.E.2d 257, 260 (1969)).

In *Hampton Roads Sanitation Dist. v. McDonnell,* 234 Va. 235, 360 S.E.2d 841 (1987), the Supreme Court of Virginia evaluated whether irregular discharges of sewage and other pollutants from a pump station constituted one cause of action when the first discharge occurred, or whether separate causes of action accrued with each successive discharge.

The Court found that each discharge created a separate cause of action. It recognized that where a claimed injury is "of a permanent nature and one that produces 'all the damages which can ever result from it, then the entire damages must be recovered in one action' and the statute of limitations begins to run from the date of the wrongful act. Conversely, when wrongful acts are not continuous but occur only at intervals, each occurrence inflicts a new injury and gives rise to a new and separate cause of action." *Id.* at 239, 360 S.E.2d 841 (citing *Norfolk & W.R. Co. v. Allen,* 118 Va. 428, 87 S.E. 558, 560 (1916)).

In *Am. Physical Therapy Ass'n v. Fed'n of State Bds. of Physical Therapy,* 271 Va. 481, 628 S.E.2d 928, 929 (2006), the Supreme Court of Virginia evaluated allegations of repeated contractual breaches (improper increases in licensure fees over a seven year period) and determined whether or not each increase in fees constituted a separate and distinct cause of action. The Court held that the defendants' actions gave rise to separate, distinct breaches of contract.

The key contractual term at question in *Am. Physical Therapy* stated that the de-

fendant periodically "shall establish prices for the Examination." The Court found that the term contemplated "a distinct obligation that arises each time the [defendant] imposes a new fee." *Id.* at 929. The new fee apparently required the company to look at fees from the previous levels and the new fee was not "evaluated by reference back solely to the amount of the original fee." *Id.* Consequently, the Virginia Supreme Court determined that the fee issue was more analogous to its *Hampton Roads* decision and not its *Westminster* situation: "As in *Hampton Roads,* the first injury did not inflict 'all the damage which can ever result'...." *Am. Physical Therapy Ass'n,* 628 S.E.2d at 930. Each imposition of a new fee resulted in a new injury and a separate cause of action, which entitled the plaintiff to bring claims for all such individual breaches which occurred in the five years preceding the filing of the law suit.

The question for this Court, then, is whether the Defendants' alleged violations are more akin to the circumstances in *Westminster,* or whether they are more akin to the circumstances in *Hampton Roads* and *Am. Physical Therapy Ass'n.* The answer to that question appears to this Court to be the former and not the latter.

In *Am. Physical Therapy Ass'n,* the contract contained a provision that required the defendant to "establish prices for the [National Physical Therapy] Examination that [we]re generally consistent (taking inflation into account) with prior levels and which [we]re not unduly burdensome to candidates." *Id.* at 930. That provision clearly envisioned that the defendant would on more than one occasion establish different prices for the Examination. It follows that the mere failure on the part of the plaintiff to challenge the first change in price—which could have been consistent with prior price levels and

therefore not have been in breach of the contract—should not have barred the plaintiff from suing for later changes in price that were in breach of the contract.

In this case, with Hunter's contract, the respective breaches occurred and the causes of action accrued when CBG stopped paying Hunter the $100 monthly auto allowance and stopped paying him commissions at the rate of 50% as it was contractually obligated to do. Unlike the contract language in *Am. Physical Therapy Ass'n* that envisioned and permitted price changes, neither action—the cessation of the monthly allowance or the change in the commission rate—was permitted or envisioned by the contract language. Consequently, each subsequent failure to pay did not constitute a new breach, but merely a continuation of the original breach as in *Westminster.*

In Hunter's situation, there was nothing "new" about CBG's alleged breaches from 1990 or 1997 to the time Hunter quit working. The breach was always the same, and the Defendants never looked back to the previous pay cycle to adjust or evaluate Hunter's commission or monthly auto allowance. Rather, the Defendants regularly and systematically applied the same rates and terms of compensation as the result of the breaches which occurred in 1990 and 1997, respectively.

Therefore, the Defendant's motion for summary is granted with respect to Count Two—that is, the Plaintiff is barred by Virginia law from filing a claim based upon breaches in contract that occurred in 1990 and 1997.

## IV. *Conclusion*

The Court finds that several of the Plaintiff's claims against the Defendants are barred by applicable statutes of limitations.

The Court finds that the Plaintiff had actual knowledge in 1996 that CBG had reduced his sales commission from 50% to 48.55% of the gross profit of his sales. The Court also that the Defendants' decision to fund the SARSEP contribution in such a way only constituted one violation under ERISA, not several. Therefore the Plaintiff's breach of fiduciary duty claim is subject to a three-year statute of limitation that began running when the Defendant had actual knowledge of CBG's plan. Consequently, with respect to the allegations of a second ERISA violation in Count One of the Plaintiff's complaint, the Defendants' Motion for Summary Judgment is **GRANTED.**

The Court finds that the Defendant has shown that there is a genuine issue of material fact as it pertains to allegations that the Defendants failed to make SARSEP contributions at the same percentage for all employees. Consequently, the Defendants' Motion for Summary Judgment is **DENIED** with respect to the Plaintiff's allegations of a third supposed ERISA violation.

The Court **GRANTS** the Defendants' Motion for Summary Judgment as it pertains to the Plaintiff's breach of contract claims alleged in Count Two. Applying Virginia law, the Court finds that there was one breach of contract rather than separate successive breaches of contract when CBG allegedly breached its employment agreement with the Plaintiff when it lowered his commission from 50% to 48.55%, and similarly only one breach of contract when the Defendants stopped paying a monthly automobile allowance.

The Clerk of the Court is **DIRECTED** to transmit a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**